# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39931**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Deric W. PRESCOTT**
Lieutenant Colonel (O-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 1 April 2022

————————————

*Military Judge:* Shelley W. Schools (arraignment); Jefferson B. Brown.

*Approved sentence:* Dismissal. Sentence adjudged 30 December 2019 by GCM convened at Peterson Air Force Base, Colorado.

*For Appellant:* Lieutenant Colonel Todd J. Fanniff, USAF; Mark C. Bruegger, Esquire; Frank J. Spinner, Esquire.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major Jessica L. Delaney, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, LEWIS, and RICHARDSON, *Appellate Military Judges*.

Chief Judge JOHNSON delivered the opinion of the court, in which Senior Judge LEWIS and Judge RICHARDSON joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

JOHNSON, Chief Judge:

A general court-martial convened by the commander of 14th Air Force and composed of officer members convicted Appellant, contrary to his pleas, of one

specification of attempted larceny and one specification of making a false official statement in violation of Articles 80 and 107, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 907.[1] The court-martial sentenced Appellant to be dismissed from the service. The commander of Space Operations Command, United States Space Force, approved the adjudged sentence.

Appellant raises the following issues[2] for our review on appeal: (1) whether Appellant's convictions are legally and factually sufficient; (2) whether the military judge abused his discretion by permitting the Government to offer evidence of Appellant's 2011 household goods claim under Military Rule of Evidence (Mil. R. Evid.) 404(b); (3) whether trial counsel made improper argument on findings; (4) whether Appellant's sentence is inappropriately severe; (5) whether the commander of Space Operations Command, United States Space Force, lacked jurisdiction to take action on Appellant's sentence; (6) whether the charged victim's subrogation and charge-back agreements with its agents render Appellant's conviction for attempted larceny legally and factually insufficient; (7) whether the military judge erred by granting the Government's challenge for cause against a court member; (8) whether the finding of guilty as to attempted larceny was ambiguous; (9) whether the court-martial ceased to be properly convened when 14th Air Force—the convening command—was redesignated Space Operations Command; (10) whether Appellant is entitled to relief for unreasonable post-trial delay; and (11) whether, in light of *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), the military judge was required to instruct the court members that a guilty verdict must be unanimous.[3] We have carefully considered issues (6), (7), (8), and (11) and find they do not require discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987); *United States v. Anderson*, No. ACM 39969, 2022 CCA LEXIS 181, at *57 (A.F. Ct. Crim. App. 25 Mar. 2022) (finding unanimous court-martial verdicts not

---

[1] Unless otherwise indicated, all references to the UCMJ, the Rules for Courts-Martial (R.C.M.), and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] For purposes of our analysis, we have consolidated Appellant's first, second, and seventh assignments of error within issue (1), and renumbered the other assignments of error accordingly. Appellant raises the issue of legal and factual sufficiency in part pursuant to *United States v. Grostefon*, 12 M.J. 431, 435 (C.M.A. 1982). In addition, we address issues (5) and (9), regarding jurisdiction, together in our analysis below.

[3] Appellant personally raises issues (6), (7), (8), (9), and (11) pursuant to *Grostefon*, 12 M.J. at 435. We granted Appellant's motion for leave to file issue (11) on 25 February 2022.

required in light of *Ramos*). We find no error materially prejudicial to Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

### A. Appellant's Household Goods Shipment

In 2011, Appellant transferred from Georgia to March Air Reserve Base (ARB), California. Following the delivery of his household goods in July 2011, Appellant submitted a claim in the Defense Personal Property System (DPS)[4] in excess of $32,000.00 for 168 items he claimed had been either damaged or were missing as a result of the move; Appellant received $16,309.22 for his claim.

In 2014, Appellant transferred from March ARB to Joint Base San Antonio, Texas. Following this move, Appellant submitted another claim in DPS for approximately $30,000.00 for 151 items that he claimed had been damaged or gone missing. The shipping company paid Appellant $20,538.24 for the claim. Appellant then filed a claim with the Air Force Claims Service Center (AFCSC) for items for which the shipping company had not paid; Appellant received an additional $6,995.90 payment from the AFCSC. The shipping company was entitled to take possession of items for which it had paid full replacement value, but did not do so, and Appellant retained these items.

In the summer of 2016, Appellant—who was single and did not live with any dependents—was transferred from Joint Base San Antonio to be the wing staff judge advocate at Minot Air Force Base (AFB), North Dakota. Before the move, Appellant contacted HS, the Deputy Director of the Joint Personal Property Shipping Office (JPPSO) in San Antonio, Texas, the office responsible for overseeing the transportation of Appellant's household goods to his new duty location. Due to concerns Appellant expressed to HS about the move, HS arranged for Appellant's 2016 household goods move to be a "Code 2" shipment, rather than the "Code D" shipment typical of moves within the continental United States. As HS explained at trial, a Code 2 shipment involves sealing

---

[4] DPS is an online system for servicemembers undergoing a permanent change of station to manage the shipment of their household goods. DPS includes a process for servicemembers to file a claim with the transportation service provider (TSP) responsible for the move for damage or loss of household goods during the shipment. The TSP adjudicates such claims. If the TSP does not pay the claim in full, the servicemember has the option of filing a supplemental claim with the applicable military claims office—for Air Force personnel, the Air Force Claims Service Center.

the servicemember's personal property inside wooden crates at the pickup location. The containers then remain sealed throughout their transportation and storage until they are opened at the ultimate delivery location for unloading. Code 2 shipments are generally considered more secure than Code D shipments.

Total Military Management (TMM) was the company selected to be the transportation service provider (TSP)[5] for Appellant's 2016 relocation. TMM management personnel were aware that Appellant had filed consecutive claims in excess of $30,000.00 following his previous two moves, and as a result they were wary of Appellant's shipment. Although TMM had the overall contract and responsibility for the move, TMM hired local companies to accomplish the packing and pickup of Appellant's household goods at origin and the delivery and unpacking at the destination—specifically, Lone Star Relocation Service (Lone Star) in San Antonio and AAction Moving and Storage (AAction) in Minot. TMM engaged a third company to carry the shipment between San Antonio and Minot.

When Lone Star employees arrived at Appellant's residence in San Antonio to pack his household goods in July 2016, they found Appellant was having repair work done on a portion of the house. After some initial hesitation but at Appellant's insistence, the Lone Star employees proceeded with packing and loading Appellant's personal property despite the presence of other workers, construction activity, and a large dumpster in Appellant's driveway.

Several circumstances resulted in certain irregularities in the documentation of the packing and pickup stage of the household goods move. For example, the Lone Star employees used multiple rolls of numbered stickers, or "tags," to place on individual items or boxes in order to identify them on the written inventory; this resulted in some different items having the same number associated with them, albeit designated from a different roll of numbers ("white" tags, "new white" tags, and "blue" tags). In addition, Appellant complained that the employees were marking an excessive number of exceptions for preexisting damage on certain items. As a result of Appellant's complaint, at the direction of DS, Lone Star's general manager at the time, several items were lined through and marked "void" on the inventory in order to re-enter them and change the description of the pre-existing damage. Furthermore, Lone Star employees attempted to use "bingo sheets" in order to note which items had

---

[5] TMM's Senior Manager of Customer Support described the company as a "move manager," a company that subcontracts with an origin agent, carrier, and destination agent to move the shipper's household goods. This opinion will refer to TMM as a "TSP" based on the documentation of Appellant's move admitted into evidence.

been placed in which crates. However, the bingo sheets, which were not mandatory documents for the household goods shipment process, were only partially filled out.

Nevertheless, on 13 July 2016 the packing and loading were complete and Appellant's household goods had been placed inside 12 wooden crates and a "sofa box." Appellant and the leader of the Lone Star crew at the site, JM, conducted a walkthrough of Appellant's residence to ensure no items to be shipped had been left behind. The crew nailed the wooden crates shut and placed "seals" (variously described as paper or plastic) on them before driving them to the Lone Star warehouse. At the warehouse, Lone Star employees then placed one or more metal bands around each crate for additional security.

Appellant's household goods were transported from San Antonio to Minot, where they remained in the AAction warehouse for some period of time until the scheduled delivery date. After arrival at the warehouse, the crates and sofa box were stored together in plain sight in their own row until delivery. According to DH, a former AAction employee who worked in the Minot warehouse at the time, all 12 crates and the sofa box were delivered in good condition. Three other individuals—QT, a then-active duty Air Force household goods quality control inspector; TP, the former AAction Minot warehouse manager; and BT, another former AAction employee in Minot—confirmed the crates had arrived in Minot unopened, with the metal bands on and the seals for the most part intact. When QT inspected the crates at the warehouse the day before they were to be delivered to Appellant, he noted that one of the seals was "messed up." However, QT and other witnesses testified that the paper or plastic seals on the containers sometimes rub off or break due to friction with other crates during transit. In this case, QT testified, he determined that the seal in question had rubbed off rather than been tampered with, and so informed Appellant at delivery.

On 22 August 2016, AAction employees delivered the 12 crates and one sofa box to Appellant's on-base residence at Minot AFB. At TMM's request, QT and another Air Force quality assurance representative were initially present for the delivery. The crates were opened at Appellant's residence, and Appellant was physically present when at least some of them were opened. As the AAction crew unloaded the items, they would call out the corresponding inventory numbers to Appellant, who was responsible for marking off the items on the inventory sheets as having been delivered. However, approximately 30 inventory items were not marked as received at destination on the inventory sheets. As the unloading progressed, Appellant expressed the opinion that a number of items had not been delivered and were missing. The crates were completely emptied, and AAction employees spent some amount of time searching the residence for items that had not been marked as received. In addition, the "parts

box" containing hardware needed to reassemble furniture items, although marked as received,[6] also could not be found, which inhibited efforts to reassemble certain items of Appellant's furniture.[7] Ultimately, Appellant did not sign the inventory on 22 August 2016. One of the AAction employees, BT, took the inventory sheets with her at the end of the day.

NJ, TMM's Senior Manager of Customer Support, had been in contact with Appellant over the course of the delivery date. Initially, Appellant told NJ that there were no "major" problems with the early stages of the unloading. However, as the day went on Appellant told NJ that he was missing items. When NJ questioned how items could be missing when all of the sealed crates had been delivered, Appellant opined that the seals had been broken and that someone may have opened the crates while they were in storage. On 23 August 2016, the day after the delivery, NJ obtained an electronic copy of the unsigned inventory sheet from AAction and emailed it to Appellant in order for Appellant to identify specific items that were damaged, missing, or required reassembly. NJ later testified that his purpose in doing so was to identify any expedited "essential items claims" for items Appellant would need immediately, and to initiate a "trace" with Lone Star and AAction to search for specific missing items. NJ testified that Appellant was "very vague about his responses" and never identified which specific inventory line items were missing. At trial, Appellant testified he did not look at the electronic copy of the unsigned inventory sheet NJ sent him until 2019, when he was preparing for his court-martial with his trial defense counsel.

Appellant and GH, another AAction employee, eventually signed the written inventory on 3 October 2016. Each of them individually signed all 12 pages of the line-item inventory; each page had a piece of carbon paper and a copy of the inventory page underneath. GH took the signed original inventory with her, and Appellant retained the copies. Significantly, on the delivery date (22 August 2016) and the date Appellant and GH signed the inventory (3 October 2016), all of the copy pages were apparently imperfectly placed underneath the originals, either too high or too low. As a result, the "X"s or check marks marking individual line items as received at the destination do not appear on the

---

[6] Appellant confirmed in his testimony that he received the parts box at destination. AAction employees testified that they looked for the parts box with Appellant on the day of delivery and could not find it.

[7] In the following weeks an AAction employee returned to Appellant's residence multiple times in order to reassemble furniture.

correct inventory lines on the copy as compared to the original. These discrepancies are discernible, although not immediately obvious, from the placement of the "X"s and check marks on the copy itself; however, the signatures of Appellant and GH and dates that they signed are more obviously out of place on the copies.[8]

## B. Appellant's 2017 Household Goods Claims

Appellant submitted his household goods claim for the 2016 move electronically in DPS in February or March 2017. He claimed 146 items as having been damaged or gone missing, for a total claimed reimbursement amount of over $41,000.00. The claim listed more than 40 items as entirely missing, which prosecution witnesses estimated had a combined weight of over 1,000 pounds; approximately 30 other items were described as missing parts or components, such as shelves for bookcases and remote controls for multiple televisions. Several items Appellant claimed as entirely missing are marked as having been delivered on the original inventory sheet, but are *not* marked as having been delivered on the copy of the inventory Appellant retained after signing on 3 October 2016, due to the alignment discrepancy with the copy described above. At trial, Appellant testified he used the carbon copies of the inventory to submit his claim, coupled with his personal knowledge of which items had not been delivered. Appellant did not amend his claim in DPS after he initially submitted it.

On 9 March 2017, MP, a self-employed furniture maker and claims inspector hired by TMM, performed an inspection at Appellant's residence of items Appellant claimed had been damaged. At trial, MP described his role as an inspector as "to determine if there is damage; and when it comes to wooden furniture, determine what it would cost to repair, if it's reparable." He did not search Appellant's residence, but inspected the items Appellant presented to him, and took photographs of some of them. MP testified that Appellant's claim was much larger than the "average" claim he inspected, which typically involved between 15 and 20 items. MP prepared a written report of his inspection for TMM. In his report, he did not specifically note whether or not there was pre-existing damage to the items he inspected.

KF, TMM's claims director, testified at trial that the company suspected Appellant was engaged in fraud in part because Appellant had asserted over 1,000 pounds of household goods were missing from a sealed Code 2 shipment. TMM employees also compared the 2017 claim with Appellant's prior claims,

---

[8] Unlike the notation of receipt and delivery on 22 August 2016 and the signatures on 3 October 2016, the carbon copies of the handwritten notations made at origin in San Antonio in July 2016, including the tag numbers, item descriptions, pre-existing damage notations, and origin signatures, were not misaligned.

and noted similarities in the types of damages and missing items that Appellant had previously claimed. In addition, the fact that Appellant claimed multiple items that had been marked on the original inventory sheet as having been delivered increased TMM's suspicions. According to KF, the average amount claimed for damage to personal property on a Code 2 shipment—absent a "catastrophic" event such as fire or mold—was under $2,500.00. TMM denied Appellant's DPS claim entirely.

After TMM denied his DPS claim, Appellant filed a claim with the AFCSC. At some point, TMM personnel contacted the AFCSC to raise concerns about the validity of Appellant's claim. As of the time of Appellant's trial, the AFCSC had not adjudicated Appellant's claim.

**C. The Investigation and Appellant's Trial Testimony**

In April or May 2017, TMM personnel and DS from Lone Star met with agents of the Air Force Office of Special Investigations (AFOSI) in San Antonio to present their suspicions that Appellant's household goods claim might be fraudulent. As a result, the AFOSI initiated an investigation led by Special Agent (SA) PD. The AFOSI developed a list of "suspicious" items by comparing Appellant's 2017 claim with the 2011 and 2014 claims TMM had brought to them.

On 12 July 2017, SA PD and another agent interviewed Appellant at Minot AFB. The AFOSI had obtained a search authorization for Appellant's on-base residence, and while the interview was going on other AFOSI agents searched the residence.

Appellant waived his Article 31, UCMJ, 10 U.S.C. § 831, rights and agreed to speak with the agents. The interview was videorecorded. While the interview was in progress, SA PD received information from the agents searching Appellant's residence regarding items they found there. In the course of the interview, the agents questioned Appellant about the 2016 move generally, about his household goods claim, and about specific items the agents searching Appellant's residence had found. Appellant denied seeking payment for any items he claimed as missing but had actually received. Notably, the agents questioned Appellant about a third-row car seat from a Chevy Tahoe they found in Appellant's garage. According to Appellant, his Tahoe had two separate seats in the third row, a left seat and a right seat. Appellant's inventory sheet indicated he had shipped two such seats; his DPS claim asserted that one of them had not been delivered and was missing. The seat found in the garage still had a tag on it from Appellant's 2014 household goods shipment. Appellant told the agents that he had bought the seat located in the garage on eBay as a replacement for the missing seat; he did not state the seat in his garage was the seat that actually had been delivered.

Although the agents conducting the search identified several items they considered suspicious with respect to the investigation and took several photographs, they did not seize any items from Appellant's residence. The AFOSI also did not search Appellant's vehicle (a Chevy Tahoe) or attempt to inspect it from the outside. While the AFOSI investigation continued, Appellant was transferred from Minot AFB to Peterson AFB, Colorado.

Several months after the interview, Appellant sent the AFOSI a typed 21-page signed memorandum, with an additional 17 pages of photographs and other attachments. The memorandum primarily consisted of explanations of particular items Appellant claimed as damaged or missing in his household goods claim. In this memorandum, Appellant acknowledged he made certain "mistakes" in his DPS claim and during his AFOSI interview. Notably, with regard to the Tahoe seat, Appellant admitted he had no record of having bought such a seat on eBay but now "believe[d] [he] recall[ed] that [he] purchased [two] Tahoe replacement seats from a garage sale near Minot, North Dakota." Appellant concluded the memorandum with a general denial that he had ever intended "to deceive or to defraud the [G]overnment, to commit a wrongful taking, or anything else with a larcenous intent," and that his "sole intent was and still remains to make a valid claim for the losses and damage that [the transportation companies] caused . . . ."

Appellant testified extensively at trial regarding the household goods shipment, claim, and AFOSI investigation. Among other testimony, he denied he was guilty of any alleged offenses. Notably, Appellant agreed his household goods were placed in a total of 12 crates and one sofa box, and he did not believe the Lone Star employees erroneously left anything behind in San Antonio. He testified that when he first saw the delivered crates at his residence in Minot, some of them had already been opened by the AAction moving crew, and the seals on the unopened crates he saw had been "ripped." Appellant acknowledged he may have made some mistakes on his claim because he was working from the misaligned carbon copies of the inventory sheets. Appellant testified that he routinely made claims for full replacement value—as determined by Internet searches—for items that had dents, scratches, or other minor damage, based on his understanding that he was allowed to request such compensation, and the additional understanding that the claims process was a negotiation and the TSP might offer to settle for a lesser amount.

On cross-examination, Appellant agreed the evidence suggested that all of the crates and the sofa box had been delivered, and that numerous items he claimed as missing were marked as having been delivered on the inventory. Specifically with regard to the Tahoe seat, for which Appellant claimed a replacement value of $995.00, he maintained that he bought two replacement seats at a garage sale somewhere in Minot for between $25.00 and $75.00, and

did not have a receipt for them. In response to questions from the court members, Appellant testified that he "got rid of" one of the Tahoe seats in July or August 2017, after he bought the two replacements, by putting it in "a stack of stuff that [he] put in front of [his] yard" for anyone to take. Appellant also testified that between MP's inspection on 9 March 2017 and the AFOSI search of his house on 12 July 2017, he replaced all of the shelves from bookcases that he had claimed as missing, acquiring many of them from "garage sales and yard sales," but he could not identify where he obtained particular shelves.

The court members found Appellant guilty of one specification of attempted larceny of over $500.00 from TMM with regard to his 2017 claim, and of one specification of making a false official statement to SA PD, in violation of Articles 80 and 107, UCMJ, respectively. The court members found Appellant not guilty of one specification of larceny with regard to his 2014 household goods claim, and of three specifications of making false official statements to SA PD, in violation of Article 121, UCMJ, 10 U.S.C. § 921, and Article 107, UCMJ, respectively.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Attempted Larceny

##### *a. Law*

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2018) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed

the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

Appellant's conviction for attempted larceny of money of a value greater than $500.00 in violation of Article 80, UCMJ, required the Government to prove: (1) that Appellant did a certain overt act, that is, filed a household goods claim which included items for which he was not entitled to payment; (2) that the act was done with the specific intent to commit a certain offense under the code, specifically larceny of money of a value greater than $500.00 from TMM; (3) that the act amounted to more than mere preparation; and (4) that the act apparently tended to effect the commission of the intended offense except for TMM personnel discovering similarities between Appellant's 2017 claim and his 2011 and 2014 claims. *See Manual for Courts-Martial*, *United States* (2016 ed.) (*MCM*), pt. IV, ¶ 4.b. The elements of larceny in violation of Article 121, UCMJ, 10 U.S.C. § 921, include: (1) that Appellant wrongfully took, obtained, or withheld certain property from the possession of the owner or of any other person; (2) that the property belonged to a certain person; (3) that the property had a certain value; and (4) that the taking, obtaining, or withholding was with the intent permanently to deprive or defraud another person of the use and benefit of the property or permanently to appropriate the property for the use of the accused or for any person other than the owner. *MCM*, pt. IV, ¶ 46.b.(1). For purposes of Article 121, UCMJ, the term "person" includes, *inter alia*, a corporation or organization. *MCM*, pt. IV, ¶ 46.c.(1)(c)(iv). "[A]n obtaining of property from the possession of another is wrongful if the obtaining is done by false pretense." *MCM*, pt. IV, ¶ 46.c.(1)(d). "A false pretense is a false representation of past or existing fact." *MCM*, pt. IV, ¶ 46.c.(1)(e). "[T]he [G]overnment is free to meet its burden of proof with circumstantial evidence . . . ." *King*, 78 M.J. at 221 (citations omitted).

### b. Analysis

#### i. General considerations

Appellant's court-martial was lengthy and complex. More than 30 witnesses testified during the findings phase, some of them multiple times, and their testimony was sometimes in conflict. The documentary, photographic, and videorecorded evidence was also extensive. Moreover, the trial was inextricably related to the household goods claims system, which inherently in-

volves a process of initial claim, negotiation, and settlement. Therefore, in order to understand the evidence supporting Appellant's convictions and properly frame our analysis, it is appropriate to clarify certain foundational aspects of the household good shipment and claims process established by the evidence presented at Appellant's trial.

First, it was permitted, and not fraudulent, for a claimant to claim full replacement value for an item that had suffered only minor damage. Second, a claimant could elect to retain a claimed damaged item, even if a TSP had paid to replace the item, provided the TSP did not exercise its right to take possession of the item for its salvage value within a particular time period. Third, if a claimant made a claim for a damaged item, received payment, and then repaired the item himself, and the item was then damaged again in the same way or a different way on a subsequent move, the claimant was entitled to seek compensation for the new damage regardless of the prior payment for the same item—even if he previously received full replacement value. Fourth, where a claimant shipped a large amount of personal property, it is likely *some* amount of damage could occur during the move, either before, while, or after the items are contained in sealed crates.

Accordingly, we do not base our review of the legal and factual sufficiency of Appellant's conviction for attempted larceny on a determination that Appellant claimed an excessive amount of money for an item that was actually damaged during the move; nor do we base it on the mere fact that Appellant sought compensation for damage to items which he had claimed had been damaged in previous moves. Instead, we focus our analysis on whether the Government proved beyond a reasonable doubt that Appellant wrongfully sought over $500.00 in payment for items that either: (1) had been delivered, but Appellant falsely claimed had not been delivered; or (2) had not been damaged during the 2016 move.

### ii. Potential explanations for items claimed as missing

With that clarification, we next note that one of the most telling aspects of the evidence in the Prosecution's favor is that Appellant claimed approximately 70 items—with an estimated weight over 1,000 pounds—were entirely or partially missing from his 2016 shipment, where his goods had been sealed inside 12 crates and a sofa box, all of which containers had been delivered essentially undamaged to his residence at Minot AFB. Appellant testified he believed that Lone Star employees had picked up all of the items on the inventory and had not erroneously left anything behind in San Antonio, a conclusion supported by the testimony of the Lone Star crew supervisor, JM, and the other available evidence. Therefore, three apparent possibilities remained for the court members to consider with regard to items claimed missing: (1) that the items were taken by moving company employees at some point in the process,

and not delivered; (2) that the items were delivered and Appellant mistakenly but honestly claimed them as missing; (3) that the items were delivered and Appellant knowingly falsely claimed them as missing, consistent with the charge of attempted larceny; or some combination of these possibilities.

Turning to the first of these possibilities, the court members could reasonably conclude that Lone Star employees did not divert a significant amount of Appellant's property at origin in San Antonio by carrying it off or otherwise disposing of it, rather than placing it in the crates to be sealed. JM testified that the Lone Star employees had done no such thing. Appellant did not report or testify to observing any such activity, and there is no other evidence of it.[9] Such activity would presumably have been readily observable by other employees, and so would likely have required some degree of collusion among them, which the court members could reasonably find unlikely. Moreover, such an explanation is implausible indeed for large items Appellant subsequently claimed as missing, such as the Tahoe seat, an entire bookcase, and entire boxes of clothing. In addition, the court members may have considered that many of the items claimed as missing were of little independent value and unlikely targets for pilferage, such as shelves from bookcases or remote control devices.

For similar reasons, the court members could have found it implausible that AAction employees carried off or otherwise disposed of these items after the crates were opened in front of Appellant's residence at Minot AFB. Testimony indicated the crates were entirely emptied, and there is no specific evidence any such theft actually occurred.

Another theory, and the one Appellant seemed to favor when discussing the missing items with NJ (TMM's Senior Manager of Customer Support) and with the AFOSI, was that the crates had been opened and items taken from them between the time the crates had been nailed shut and the seals placed at Appellant's San Antonio residence, and when they were opened at his residence at Minot AFB. However, the court members could reasonably conclude this explanation was also highly unlikely. First, QT, the Air Force quality control inspector, testified that he inspected the crates at the AAction warehouse in Minot the day before delivery and, with one exception, found the seals and metal bands intact. With respect to the "messed up" seal, he determined it had been disturbed by friction with other crates during transit. Even if the court members considered that the seals might have been broken, or were replaced with unbroken ones, and that the metal bands might have been removed to

---

[9] Similarly, there is no evidence whatsoever that the construction workers improperly removed any of Appellant's household goods, or that the items were deposited in the dumpster in his driveway.

allow access to the crates and then replaced, they still could have found theft from the sealed crates to be an unpersuasive explanation. The evidence indicated that Appellant claimed items as missing from multiple crates. Moreover, as noted above, the independent value of many of the missing items was relatively low.[10] The members could have reasonably concluded the likelihood was extremely low that larcenous persons with access to the crates went to the trouble of breaking the seals, removing the metal bands, and removing the nails from multiple crates, only to take items of relatively little value to thieves,[11] and then seal the crates again, either without detection by, or in collusion with, others.

The court members may also reasonably have concluded that Appellant's household goods claim cannot be entirely explained by innocent mistakes. It is true that Appellant owned numerous duplicative items of household goods and furniture of particular types, such as bookshelves and cat furniture, which could in theory increase the potential for mistakes in claiming particular items. However, Appellant was by his own admission, and supported by the other evidence and testimony, very particular about his household goods and meticulous in pursuing household goods claims. Moreover, Appellant spent at least five months living in the residence where his household goods had been delivered before he filed his claim in DPS, and he testified he searched his house for the missing items. Appellant did not amend his claim at any point during the nearly two months it was pending with TMM. The court members could reasonably have found some of the items claimed as missing, such as the Tahoe seat, were very unlikely to be mistakenly overlooked, and that it was implausible Appellant would have overlooked an aggregate 1,000 pounds worth of goods.

Furthermore, the court members could have found the discrepancy with Appellant's carbon copies of the inventory sheets particularly telling with regard to the absence of mistake. Appellant claimed multiple items that were marked as delivered on the original inventory, but appeared to be marked as not delivered on Appellant's copy, including one of the Tahoe seats. Thus, the court members could reasonably infer Appellant believed the inventory inaccurately indicated certain items had not been delivered, and then based his DPS claim not on what items had been actually delivered, but what items he believed he could get TMM to pay for based on the documents.

---

[10] However, the replacement value for the missing items, or the items from which parts or components were missing, for which Appellant was permitted to claim compensation, was much higher than the likely resale value of the missing items and parts.

[11] Appellant did not claim any of the computers or televisions listed on the separate "High Risk/High Value Inventory" as missing.

Accordingly, the court members could reasonably have found Appellant falsely seeking payment for items he claimed as missing, which had in fact been delivered, to be the only plausible explanation, considering the alternative explanations of employee pilfering or innocent mistakes. Additional reasonable inferences from the evidence further support such a conclusion.

### iii. Implausible explanations and other considerations

Despite Appellant's insistence on his innocence, the court members could reasonably have found some of his statements to AFOSI and testimony implausible and generally damaging to his credibility.

The court members could reasonably have found Appellant's explanation of the Tahoe seat the AFOSI found in his garage to be evidence of consciousness of guilt. During Appellant's AFOSI interview, the agents confronted him with the fact that he had claimed a Tahoe seat had not been delivered, yet one had been found in his garage. One might expect Appellant's response would have been simple—he shipped two Tahoe seats, but only one was delivered, and the one that arrived was the one in his garage. But that is not what he said. Appellant immediately responded (wrongly) that he had bought the Tahoe seat in his garage on eBay as a replacement. In other words, Appellant did not respond as someone who had an obvious explanation for the item, but as someone who had been discovered with an unexplained Tahoe seat in his garage.

Appellant might have recovered by later explaining he was confused during the interview and subsequently clarifying the Tahoe seat in the garage was not a replacement he had purchased, especially as the seat had a sticker from his 2014 move on it. Instead, his explanation continued to grow more strained. In his written memorandum to AFOSI prepared months after the interview, Appellant explained that his confident assertion he had purchased the seat on eBay had been a mistake, and that he had instead found and bought a matching set of replacement Tahoe seats in the same color as the originals at a garage sale in Minot at some point between August 2016 and July 2017, at a location he could no longer remember, and forgot to mention during the interview. The court members may have found this explanation both unlikely and suspiciously convenient, in that unlike an online purchase, the purported garage sale provided no receipt or other proof beyond Appellant's word. At trial, Appellant elaborated on this explanation in ways the court members might reasonably have found additionally suspicious. For example, Appellant—despite defense evidence that he had been diagnosed with a "hoarding disorder"[12] and retained

---

[12] In April 2019, a board convened pursuant to R.C.M. 706 determined that Appellant did not suffer from a severe mental disease or defect at the time of the alleged offenses,

many superfluous furnishings and items of various types, who was meticulous about seeking compensation for damage to his property, and who claimed $995.00 as the replacement value of the Tahoe seat in his DPS claim—testified he simply discarded one of the Tahoe seats after he bought the two replacements, such that at the time of his trial he owned only two Tahoe seats.[13] The court members might reasonably have doubted this claim of disposing of the third Tahoe seat, again without supporting evidence, and considered whether the two third-row Tahoe seats Appellant claimed to own in November 2019, during his court-martial, were the same two he owned before his 2016 move.

Appellant made similar claims that he bought at garage sales replacement shelves for the bookcase shelves he claimed were missing from his household goods shipment. Again, Appellant provided no details as to where he had purchased the shelves or other confirming evidence. The court members might reasonably have doubted this convenient explanation as to why his bookcases had shelves in them when the AFOSI searched his residence in July 2017, after Appellant displayed bookcases with missing shelves to the claims inspector MP on 9 March 2017. The court members may have also considered that bookshelves would be relatively easy to remove and conceal, for purposes of making a false claim; that the shelves would seem to have relatively little independent value as targets of pilferage; and that Appellant had made similar assertions of missing bookshelves in his previous DPS claims.

### iv. Evidence with respect to specific items

Next we consider whether the Government introduced sufficient evidence with regard to particular claimed items to permit the court members to find beyond a reasonable doubt that Appellant sought to obtain more than $500.00 from TMM by false pretenses. What follows is not an exhaustive list, but includes some of the items the court members could reasonably have concluded the Government proved Appellant falsely claimed. The items Appellant claimed fall generally into one of two categories: missing items and damaged items.

### v. Specific items claimed as missing

Appellant claimed $995.00 replacement value for the Tahoe seat he asserted had not been delivered. As discussed above, both Tahoe seats were marked as delivered on the original inventory, although only one appeared to

---

that he was able to understand the nature and quality of his conduct, and that he was able to understand and participate in the proceedings against him.

[13] The Defense's expert witness in forensic psychology who diagnosed Appellant's hoarding disorder admitted on cross-examination it "was unusual" that someone with that diagnosis would discard such an item, and he was "a little surprised to hear that."

be so marked on Appellant's carbon copy. The court members could reasonably conclude the Tahoe seat was not misplaced during shipment. Due to its size, the court members reasonably may also have found the Tahoe seat was very unlikely to have been pilfered by moving company employees, or to have been overlooked by Appellant if it was delivered to his residence. The court members could have reasonably found Appellant's evolving explanation for the presence of the Tahoe seat in his garage to be improbable, suspiciously convenient, and indicative of consciousness of guilt. Although the AFOSI agents only found one Tahoe seat at Appellant's residence, the court members could reasonably have concluded Appellant—intent on falsely claiming one seat as undelivered—had replaced only one of the seats in his Tahoe, or put one of the seats somewhere the agents did not see it.

Appellant claimed over $2,300.00 for what he asserted were shelves missing from furniture.[14] As discussed above, the court members could have reasonably found it unlikely these shelves were lost, pilfered by movers, or overlooked by Appellant when he filed his claim in DPS. The court members could have reasonably found Appellant's claim that he bought replacement shelves at unspecified garage sales after MP's inspection on 9 March 2017 but before the AFOSI search on 12 July 2017 to be suspiciously convenient and non-credible. They likely also noticed Appellant made similar claims for lost shelves in 2011 and 2014. The court members may have reasonably concluded the shelves were delivered and Appellant simply concealed them during MP's inspection in order to claim full replacement value for several items of furniture.

Appellant claimed $298.00 for a "bookcase," tagged as inventory number 61, he asserted was not delivered, but which the AFOSI agents found in his house with all its shelves in place.

Appellant claimed $35.99 for a missing "cat pole," tagged as inventory number 116, one of several items of furniture Appellant owned for his pet cats. This item was marked as having been delivered on the original inventory form, but was not marked as delivered on Appellant's carbon copy. The AFOSI agents found this item in Appellant's home during their search on 12 July 2017. Appellant asserted that claiming this item had been a mistake on his part. However, under the circumstances, the court members could reasonably doubt Appellant's explanation and conclude Appellant attempted to seek compensation

---

[14] Appellant claimed additional damage to some of these items, but as Appellant's usual practice was to claim full replacement value for any loss or damage, in nearly all of these instances he claimed the same amount per item irrespective of whether missing shelves was the only loss or damage. In addition, this total does not include an entire bookcase Appellant claimed as missing.

for an item he knew had been delivered but was marked as not having been delivered on his carbon copy of the inventory.

Appellant claimed a total of $63.98 for three undelivered remote controls for various devices, and an additional $1,510.00 for five other items with damage that included missing remote controls. For the reasons discussed above, the court members may reasonably have found it unlikely that these were pilfered. They may have also considered that such devices could be easily concealed by a person intent on making a false claim. They may have additionally noted, and found suspicious, that Appellant had previously claimed multiple remote controls had gone missing during his 2011 and 2014 household goods shipments.

Appellant claimed $299.00 for a box tagged as inventory item number 22 and identified as "file" on the inventory form. Appellant claimed the box contained papers and miscellaneous items taken from a cabinet; it was one of several boxes of items Appellant claimed had not been delivered. Due to the discrepancy between the original inventory and Appellant's carbon copy described above, the box was marked as undelivered on Appellant's copy but marked as delivered on the original. One of the defense exhibits admitted at trial is a photograph that Appellant testified was taken inside his residence on 22 August 2016; visible on the floor is a box labeled and tagged "22" with "Paperwork Guest Room" written on the side. At trial, Appellant testified that his claim for this item was a mistake. However, based on the evidence, the court members could reasonably conclude the box had been delivered, that Appellant had not innocently overlooked it when he made his claim, and that he falsely attempted to obtain payment for it to which he was not entitled.

### vi. Specific items claimed as damaged

At trial and on appeal the Government has argued Appellant also falsely claimed damage had been incurred on several items during his 2016 move that was actually pre-existing damage. Several of these items are worth noting here as supporting Appellant's conviction for attempted larceny.

In 2014, Appellant made a claim for damage to the top left corner of a particular wooden bookcase. The claim inspector who inspected Appellant's 2014 claim took a photograph of the claimed damage, consisting of minor scuff and/or paint marks. In his 2017 DPS claim, Appellant again claimed for damage to the top left corner of this bookcase, seeking $298.00. However, Lone Star employees took a photograph of the condition of the piece before loading it into a crate, and this pre-move photograph appears to depict the same "damage" that Appellant had claimed in 2014. In other circumstances reasonable court members might have attributed this to a simple mistake on Appellant's part;

however, given the totality of the evidence such court members may have instead reasonably found the evidence indicative of Appellant's intent to claim compensation from TMM to which he knew he was not entitled.

In 2011, Appellant claimed $799.99 for a Fender speaker with damage described as "rear plug/outlet broken off/cracked." A photograph of the damage was entered in evidence at trial. In 2017, Appellant claimed $649.00 for the same speaker with the damage described as "Backoutlet smashed in." The speaker was also photographed for the 2017 claim, and that photograph was introduced at trial. The photographs from 2011 and 2017 appear to show the exact same damage to the speaker, with one of the two rear outlet plugs pushed into the speaker and to one side in a distinctive way. In his memorandum to the AFOSI, Appellant asserted that "[a]round 2013 [he] was able to pull the outlet/plug back out," but in 2016 the same "exact damage" happened again to the same outlet plug. However, in light of the photographs and the totality of the evidence, the court members reasonably could have disbelieved Appellant's explanation and concluded that in 2017 Appellant fraudulently sought compensation for pre-existing damage to the speaker.

In 2011, Appellant claimed a total of $798.00 for a Bowflex adjustable dumbbell weight set he asserted was missing some of its weights and had a scratched and dented frame. In 2014, Appellant again claimed the set was missing some of its weights and claimed $369.00. In 2017, Appellant again claimed weights were missing from the set and that the frame was scratched and dented, seeking replacement value of $799.00. In addition to noting an improbable pattern in Appellant's claims, for the reasons indicated above, the court members might reasonably doubt that these two individual weights would have been singled out for pilfering during the shipment. The court members might also have considered that someone intent on making a false claim could easily conceal the two weights, claim full replacement value for the set, and still make use of the weight set.

In 2011, Appellant claimed $39.99 for a metal music stand that had been bent during the move. The claims inspector in 2011 took a photograph of the music stand which was introduced at trial. The claims inspector testified the apparent damage was "the left-hand side of the music stand is sloping down so the whole thing has a curve to it across the top." In 2014, Appellant again claimed a metal music stand that was "bent" at the "top," receiving the $59.00 he claimed for it. In 2017, Appellant claimed for a music stand that was "bent" on the "top part," seeking $38.00; the Government introduced at trial a photo of this item as well. Appellant testified that the music stand he claimed for in 2014 was not the same one he claimed for in 2017. However, on cross-examination, trial counsel confronted Appellant with his written memorandum to the AFOSI wherein he stated it *was* the same stand in both claims, that he had

self-repaired it after the 2014 move, and that it had been damaged again in 2016. Appellant testified that he had been mistaken in his memorandum. However, under the circumstances, the court members could reasonably conclude Appellant falsely claimed that pre-existing damage to the music stand had been caused during the 2016 shipment.

In 2014, Appellant claimed $79.00 for a "crack" in a plastic garage shelf unit. The 2014 claim inspector took a photograph of the item which was introduced as evidence at Appellant's trial. In 2017, Appellant again claimed the garage shelf unit, seeking $72.00 due to "[s]helf cracked from disassembly." MP, the 2017 claim inspector, also took photographs of the shelf which appeared to show the same crack in the unit. At trial, on cross-examination and in response to court member questions, Appellant acknowledged he claimed the same shelf unit in 2014 and 2017, and that he had not attempted to repair the crack itself. He testified that the shelf unit was designed to be disassembled; that he had glued the pole of the shelf in place so that movers would not take it apart; that the movers had nevertheless taken the item apart; and this disassembly was the "damage" to the unit that he had claimed. However, the photographs of the damage taken by the claims inspectors in 2014 and 2017, presumably based on Appellant's explanation of the claim, both clearly depict the same crack. Under the circumstances, the court members could reasonably have disbelieved Appellant's explanation for the claim and found Appellant wrongfully sought compensation from TMM for pre-existing damage to the shelf unit.

### vii. Appellant's arguments regarding attempted larceny

Appellant makes several arguments attacking the sufficiency of the evidence supporting his conviction for attempted larceny. We have accounted for some of these arguments in our analysis above, and not all of them warrant discussion, but we address the most significant remaining points here.

Appellant cites several actions on his part regarding his household goods shipment that he contends are inconsistent with a scheme to submit a fraudulent claim. For example, he argues that drawing attention to himself and his prior claims by contacting JPPSO before his move, and agreeing to a more secure Code 2 containerized shipment, would not make sense if Appellant had been already intent on making an extensive claim for lost and damaged items. Such reasoning does not overcome the evidence described above that Appellant did, in fact, make false claims. Moreover, the relevant point in time with regard to Appellant's intent to commit larceny, for purposes of his conviction, was not before the shipment. The relevant point was when he made his claim after the shipment, perhaps informed by what he believed were advantageous discrepancies in the documents. In addition, the evidence Appellant cites does not necessarily disprove his early intent to pursue a fraudulent claim. His previous

experience with securing a large settlement for his prior household goods claim, and lack of prior experience with Code 2 shipments, may have made him overconfident in his ability to secure a settlement for the 2016 shipment.

Appellant cites errors in the AFOSI investigation and report, which SA PD admitted during his testimony. For example, SA PD admitted it was a mistake not to seize suspicious items found during the search of Appellant's residence or to examine his vehicle, and that some conclusions regarding false claims included in the report of investigation were inaccurate. However, Appellant's conviction was not based on AFOSI's report or evidence the agents failed to collect, but on the evidence introduced at his trial. As described above, the evidence and reasonable inferences derived from it support Appellant's conviction.

Appellant's strongest argument has to do with the specific wording of the specification of attempted larceny of which he was convicted. The specification reads, in pertinent part:

> [Appellant] did, at or near Minot [AFB], North Dakota, between on or about 1 February 2017 and on or about 30 April 2017, attempt to steal money of a value greater than $500[.00], the property of [TMM], by filing a household goods claim which included items for which [Appellant] was not entitled claims payment *and would have resulted in such payment except for [TMM] personnel discovering similarities between [Appellant's] 2017 household goods claim and [his] 2011 and 2014 household goods claims.*

(Emphasis added). The reason why an attempt to commit an offense charged under Article 80, UCMJ, did not succeed is not an element of the offense of attempt, and was not required to be included in the specification. Nevertheless, Appellant argues that the Government, having elected to include this language in the specification, was required to prove it beyond a reasonable doubt in order to secure Appellant's conviction as charged.

In addition, Appellant cites the following exchange during the direct examination of KF, TMM's claims director:

> Q. [Trial Counsel:] Ma'am, you talked previously about your foreknowledge of the 2011 and 2014 claims at the time that you evaluated the 2017 claim. Is that correct?
>
> A. [KF:] Correct.
>
> Q. Had you made comparisons of the 2011 and 2014 claim to the 2017 claim at the time you evaluated that claim?
>
> A. Yes.

Q. And did the similarities between the 2011, 2014, and 2017 claims play into TMM's decision to deny the 2017 claim?

. . .

A. Yeah.

Q. I'm sorry?

A. Yes.

Q. Okay. And can you explain to the members how so? How did the 2011 and 2014 claims play into your decision to deny the 2017 claim?

A. Both due to the similarities in the claim's items, the types of damage to the items that were being claimed, but most importantly due to the size and dollar amount of each one of those claims.

Q. Is it possible that but for the information you had about the 2011 and 2014 claims, that the 2017 claim could have been adjudicated differently?

A. I think it's possible that it would have been adjudicated differently, but I think that there is a strong likelihood that there still would have been a similar outcome as to this.

Q. And why do you say that?

A. Based on the manner in which we moved the shipment and retained oversight of the shipment, claims -- or shipments that we handle in this type of manner have not ever before led up to this kind of claim, and it would have been suspect at that time, regardless of the previous other claims.

Shortly thereafter, on cross-examination, KF had the following exchange with trial defense counsel:

Q. [Trial Defense Counsel:] [ ] And, correct me if I get this wrong, but I believe your testimony was that you, even without that data, 2011 and 2014, both the claims, and in 2014 the claims and inspection report, we may have -- you may have been at the same place. Correct?

A. [KF:] Yes. I think there would have been a portion of the claim that we would have referred or transferred due to suspect that it was not a true and valid claim.

Q. And what portion is that, ma'am?

> A. The missing, and in addition some of probably the damages,
> too.

Appellant contends KF's testimony that there was a "strong likelihood" of a "similar outcome" for Appellant's 2017 claim even without the information from the 2011 and 2014 claims defeats proof beyond a reasonable doubt that Appellant's attempted larceny failed because of TMM's knowledge of his 2011 and 2014 household goods claims.

In response, the Government admits it is "unclear" why it chose to include this "surplus" language regarding the reason Appellant's attempted larceny was unsuccessful. However, the Government suggests that if this court finds the Prosecution failed to prove this language, this court could "strike" the surplus language from the specification. We disagree. "While Article 66, UCMJ, [10 U.S.C. § 866,] provides extensive powers of appellate review to service [C]ourts of [C]riminal [A]ppeal, it does not permit after-the-fact revisions to the charge sheet that sweep more broadly than what was alleged, and what an appellant was convicted of, at trial." *United States v. English*, 79 M.J. 116, 122 (C.A.A.F. 2019). To strike the language as the Government proposes would be to "affirm a charge with a broader factual basis than the Government originally charged and proceeded on at trial," in violation of Appellant's due process rights. *Id.*

Therefore, the question becomes whether the Government proved the "surplus" language, notwithstanding KF's testimony, such that the court members could find it beyond a reasonable doubt. We conclude the evidence does support such a finding.

First, in light of the totality of the evidence, the court members could have reasonably found unpersuasive KF's speculative opinion about what would have happened to Appellant's 2017 claim if TMM had not had the information from his 2011 and 2014 claims. The evidence indicated TMM's knowledge of the prior claims significantly influenced the company's actions and the progress of the subsequent AFOSI investigation. KF testified that Appellant's case presented "unique circumstances;" that she had never in 11 years previously encountered an individual who had "experienced" claims in excess of $30,000.00 on three consecutive moves; and agreed that it was because Appellant had made such large previous claims that his 2016 shipment was "under the microscope." Not only the amount of money claimed and number of items, but also the similar nature of the claims from one move to the next is striking. TMM took evidence of the prior claims to the AFOSI which led to the criminal investigation against Appellant. SA PD testified the AFOSI used this information from Appellant's prior claims to develop their list of suspicious items to investigate. The court members were free to draw their own conclusions from

the evidence about the significance of Appellant's prior claims rather than rely on KF's speculation.

Second, even if the court members credited KF's speculation, taken as a whole her testimony indicated KF believed TMM would have paid part of Appellant's claim but for its knowledge of the 2011 and 2014 claims. KF's testimony on cross-examination that there "would have been a portion of the claim" that TMM would not have paid implied TMM *would* have paid for another portion—specifically, some of the claims for damaged items. Above, we analyzed several items for which the court members could reasonably conclude Appellant fraudulently sought payment from TMM for pre-existing damages. With regard to most of these items—specifically the Fender speaker, Bowflex weights, music stand, and plastic shelf unit—evidence from 2011 and 2014 played a vital role in demonstrating the fraudulent nature of the claims. The total amount claimed for these four items alone was over $1,500.00. Accordingly, the court members reasonably could have found TMM would have paid Appellant over $500.00 for fraudulent claims "except for [TMM] personnel discovering similarities between [Appellant's] 2017 household goods claim and [his] 2011 and 2014 household goods claims," as charged.

Accordingly, the evidence supports the court members' finding that Appellant is guilty of the specification as charged.

### viii. Conclusion with Regard to Attempted Larceny

Drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's conviction for attempted larceny beyond a reasonable doubt. Additionally, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

### 2. False Official Statement

#### a. Additional Background

In 2011, Appellant sought compensation for damage to a Fender speaker, specifically to an input plug on the rear of the item. Appellant did not claim for damage to the front of the speaker. At trial, the Government introduced the testimony of WW, the claims inspector who inspected Appellant's 2011 claim on behalf of the TSP, and a photograph WW took of the claimed damage. WW testified that he did not observe or photograph any damage to the front of the speaker.

In 2017, Appellant again claimed damage to the "back outlet" of the same Fender speaker. Appellant's written memo to AFOSI addressed this item. Appellant stated,

In 2011, the movers smashed in the front screen and broke the back outlet. Around 2013, I was able to pull the outlet/plug back out. In 2016, there were additional scratches on the speaker and I noticed that the rear plug had broken again. I put in a claim for the broken rear plug.

At trial, the Government introduced a photograph the claim inspector, MP, took in March 2017 of the claimed damage to the rear of the speaker. In his testimony, MP described the damage as one of the "recessed parallel inputs" being missing.

During Appellant's cross-examination, he acknowledged that if the front of one of his speakers was "smashed in," he "usually would" claim it unless he forgot to for some reason. He also acknowledged he was "very detailed" with his household goods claims.

### b. Law

The standards applicable to our review of the legal and factual sufficiency of a conviction are set forth in Section II.A.1.*a.*, *supra*.

Appellant's conviction for making a false official statement in violation of Article 107, UCMJ, required the Government to prove: (1) that Appellant signed a certain official document or made a certain official statement; (2) that the document or statement was false in certain particulars; (3) that Appellant knew it to be false when he signed or made it; and (4) that the false document or statement was made with the intent to deceive. *See MCM*, pt. IV, ¶ 31.b. "[S]tatements to investigators [may] be prosecuted under Article 107, UCMJ, as false official statements." *United States v. Nelson*, 53 M.J. 319, 326 (C.A.A.F. 2000).

### c. Analysis

The court members found Appellant guilty of the following specification:

[Appellant] did, at or near Peterson [AFB], Colorado,[15] between on or about 25 January 2018 and on or about 6 February 2018, with intent to deceive, make to [SA PD], an official statement, to wit: "In 2011, the movers smashed in the front screen and broke the back outlet. Around 2013, I was able to pull the outlet/plug back out. In 2016, there were additional scratches on the speaker and I noticed that the rear plug had broken again. I put in a claim for the broken rear plug," or words to that effect, which

---

[15] Appellant was reassigned from Minot AFB to Peterson AFB, Colorado, after the AFOSI investigation began.

statement was totally false, and was then known by [Appellant] to be so false.

We conclude the court members—who observed Appellant and the other witnesses testify in person and could assess their credibility—could reasonably find the charged statement was false. Based on the evidence from 2011, the court members could find that contrary to Appellant's assertion the front of the speaker was not "smashed in." In light of the entirety of the evidence in the case, the court members could also find that the rear plug of the speaker was not "repaired" by Appellant himself prior to his 2016 move, and then coincidentally damaged in the same location again in 2016, or that the speaker had new "scratches" for which Appellant did not claim. The court members could further reasonably conclude Appellant knowingly made these false statements with the intent to deceive, in an attempt to deflect suspicion that he falsely claimed pre-existing damage was incurred during his 2016 household goods shipment.

Drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's conviction for false official statement beyond a reasonable doubt. Additionally, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

## B. Mil. R. Evid. 404(b)

### 1. Additional Background

Appellant was not charged with committing an offense in relation to his 2011 DPS claim. However, on 30 November 2018, pursuant to Mil. R. Evid. 404(b), the Government provided notice to the Defense of, *inter alia*, the following:

> Between on or about 29 June 2011 and on or about 23 November 2011, [Appellant] stole money of a value greater than $500[.00] by fraudulently claiming portions of his household goods shipment were either damaged or lost and receiving payment for items which were not damaged or lost. This is evidence of motive, intent, common scheme/plan, knowledge, and lack of mistake for the 2014 and 2017 claim[s].

Before trial, the Defense submitted a motion in limine which sought to preclude the Government from introducing "any discussion of the total claims amounts from [Appellant's] 2011, 2014, and 2017 [sic] moves, a comparison of these claimed amounts, and any evidence discussing the 'catastrophic' nature of the claims" as "irrelevant, barred by [Mil. R. Evid.] 404(b) . . . and unduly

prejudicial pursuant to [Mil. R. Evid.] 403." The Government opposed the defense motion. Specifically with regard to evidence of the 2011 claim, the Government's written opposition reiterated that evidence of the 2011 claim was relevant to show Appellant's motive, intent, common plan or scheme, knowledge, and lack of mistake with regard to his 2014 and 2017 claims, as well as his "opportunity" to file fraudulent claims. The Government further contended the probative value of the 2011 claim was "extremely high," and the danger of any unfair prejudice to Appellant was low.

The military judge conducted a hearing on the motion and received argument from both parties. During argument, civilian trial defense counsel clarified that the Defense agreed the Government should be able to bring up individual items that were claimed in 2011 if it alleged the same items were fraudulently claimed again in 2014 or 2017; however, the Defense contended the overall amount Appellant claimed (approximately $32,000.00) and was awarded (approximately $16,000.00) in 2011 should be excluded as irrelevant and unfairly prejudicial. In response, the circuit trial counsel (CTC) conceded the Government lacked the evidence for "a good faith basis to argue" the 2011 claim was itself fraudulent, but contended the 2011 claim was the "impetus" for Appellant's allegedly fraudulent 2014 and 2017 claims. The CTC argued the 2011 claim was relevant to show Appellant's motive, common plan or scheme, and knowledge of the claims process.

In an oral ruling, the military judge denied Appellant's motion with respect to the total amounts of the 2011, 2014, and 2017 claims. He explained:

> I am persuaded there is relevant non-propensity basis for the [G]overnment comparing the entirety of these three claims in demonstrating the similarities between them. Specifically, I find that the evidence of a common scheme or plan as to the 2014 and 2017 claims is appropriate. In addition, I find that the details of the 2011 claim are admissible to demonstrate the accused's knowledge of the claims process, and when and how claims may be settled, as well as the amount of money that could potentially be claimed through the household goods claims process. The probative value of admitting and contrasting these three similar claims provided in three successive moves is not substantially outweighed by the danger of unfair prejudice or confusion of the issues. The court, however, will entertain a proposed instruction by the [D]efense regarding the appropriate use of any evidence about the 2011 claim, or the differences between what is claimed and what is ultimately paid out to a claimant.

27

During trial, the Government introduced evidence of the items and amounts Appellant claimed in 2011, 2014, and 2017. The military judge provided the following instruction to the court members before their deliberations on findings, and prior to closing arguments by counsel:

> Uncharged Misconduct/Other Acts: You may consider evidence that the accused filed a 2011 household goods claim, and the circumstances of that claim, for the limited purpose of its tendency, if any, to prove a plan or design of the accused to wrongfully obtain money through false claims for broken or missing items through subsequent household goods moves, the accused's knowledge of how certain claims are processed and settled, or to rebut a contention that the alleged offenses were the result of accident or mistake.

Trial defense counsel did not propose an instruction, nor object or seek to augment this instruction with respect to the 2011 claim. At the conclusion of his findings instructions, the military judge asked, "Do counsel object to the instructions given or request additional instructions?" Civilian trial defense counsel responded, "No, Your Honor."[16]

### 2. Law

We review a military judge's ruling pursuant to Mil. R. Evid. 404(b) for an abuse of discretion. *United States v. Hyppolite*, 79 M.J. 161, 164 (C.A.A.F. 2019) (citation omitted). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citation omitted). "The abuse of discretion standard is a strict one, calling for more than a mere difference of

---

[16] Although not raised as an assignment of error, Appellant asserts there was a conflict between the military judge's oral ruling, which Appellant asserts appeared to limit the evidence of a common plan or scheme to the 2014 and 2017 claims, and the instruction, which permitted the court members to consider the 2011 claim with respect to the existence of a common plan or scheme in 2014 and 2017. However, by stating it had no objection to the instruction, the Defense affirmatively waived any objection to such a discrepancy. *See United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2019). Recognizing our authority under Article 66, UCMJ, 10 U.S.C. § 866, to pierce an appellant's waiver in order to correct a legal error, we decline to do so. *See United States v. Hardy*, 77 M.J. 438, 443 (C.A.A.F. 2017). A fair reading of the military judge's ruling conveys his intention to permit evidence of "the entirety of [all] three claims" as "evidence of a common scheme or plan as to the 2014 and 2017 claims," and we find the military judge's instructions as a whole did not unfairly prejudice Appellant.

opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997); *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987)).

Mil. R. Evid. 404(b) provides that evidence of a crime, wrong, or other act by a person is generally not admissible as evidence of the person's character in order to show the person acted in conformity with that character on a particular occasion. However, such evidence may be admissible for another purpose, including, *inter alia*, proving knowledge, absence of mistake, or the existence of a plan. Mil. R. Evid. 404(b)(2). The list of potential purposes in Mil. R. Evid. 404(b)(2) "is illustrative, not exhaustive." *United States v. Ferguson*, 28 M.J. 104, 108 (C.M.A. 1989). We apply a three-part test to review the admissibility of evidence under Mil. R. Evid. 404(b):

> 1. Does the evidence reasonably support a finding by the court members that [the] appellant committed prior crimes, wrongs or acts?
>
> 2. What "fact . . . of consequence" is made "more" or "less probable" by the existence of this evidence?
>
> 3. Is the "probative value . . . substantially outweighed by the danger of unfair prejudice"?

*United States v. Staton*, 69 M.J. 228, 230 (C.A.A.F. 2010) (alterations in original) (quoting *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989)). Where the military judge does not conduct the balancing inquiry of the third prong of the *Reynolds* test on the record, we afford his ruling less deference. *See United States v. Barnett*, 63 M.J. 388, 396 (C.A.A.F. 2006).

**3. Analysis**

Appellant asserts the military judge abused his discretion by permitting the Government to use evidence of Appellant's 2011 claim to demonstrate the existence of a common plan or scheme with respect to the 2014 and 2017 claims, pursuant to Mil. R. Evid. 404(b). We disagree.

With regard to the first element of the *Reynolds* test, Appellant concedes the Defense did not contest that sufficient evidence existed with regard to the 2011 claim. We agree this prong was satisfied.

With regard to the second element, we agree with the military judge that evidence of the 2011 claim was relevant to show Appellant's knowledge of the claims process, the absence of mistake as to items Appellant wrongly claimed, and the existence of a common scheme or plan across the 2014 and 2017 claims. Appellant cites *United States v. Morrison* for the proposition that "uncharged acts 'must be almost identical to the charged acts' to be admissible as evidence

of a plan or scheme." 52 M.J. 117, 122 (C.A.A.F. 1999) (quoting *United States v. Brannan*, 18 M.J. 181, 183 (C.M.A. 1984) (additional citation omitted). However, this is such a case. Appellant's uncharged act of filing a very large household goods claim, including specific claims of damaged and lost items that were repeated in subsequent claims, was essentially the same as the charged larceny in 2014 and attempted larceny in 2017. Appellant argues that the 2011 claim was fundamentally different because the Government did not have evidence the 2011 claim itself was fraudulent. We disagree. Mil. R. Evid. 404(b) does not require that the uncharged act itself be criminal. *See United States v. Dairo*, 75 M.J. 867, 871–72 (A. Ct. Crim. App. 2016) ("[T]he legality of the prior act is 'irrelevant to [its] admissibility' under [Mil. R. Evid.] 404(b)." (second alteration in original) (citations omitted)). Moreover, the relevance of the 2011 claim does not hinge on its criminality. Even if the 2011 claim was itself entirely valid, Appellant's experience with the process of filing a large household goods claim was relevant to show his knowledge of the process and the existence of his subsequent fraudulent plans in 2014 and 2017. For example, the court members could reasonably infer that Appellant learned from his 2011 experience how TSPs go about investigating such claims, their salvage practices, and what types of claimed loss or damage are more or less likely to be compensated.

Turning to the final element of the *Reynolds* test, we note the military judge did not specifically articulate his balancing of the probative value against the potential for unfair prejudice; accordingly, we afford his ruling less deference. *See Barnett*, 63 M.J. at 396 (explaining the mere recitation that "the probative value of th[e] evidence is not substantially outweighed by its prejudicial impact" warrants less deference from appellate courts). Nevertheless, we agree with the military judge that the probative value of the 2011 claim was not substantially outweighed by the danger of unfair prejudice. As described above, Appellant's experience with the 2011 claim tended to show he approached his 2014 and 2017 claims with particular knowledge of the household goods claims process and a plan to file large, unjustified claims.

Appellant argues that the admission of evidence that Appellant's 2011 claim exceeded $30,000.00 was "both prejudicial and confusing" because it created an inference the 2011 claim was also fraudulent. We are not persuaded such concerns substantially outweighed the probative value. It is the similarities between the 2011 claim and subsequent claims that establish its relevance as to Appellant's knowledge and subsequent scheme or plan. Such prejudice is not unfair. Whether or not trial counsel misused or mischaracterized the evidence in argument to suggest the 2011 claim was also fraudulent—addressed below—is a separate question and not inherent in the military judge's ruling.

Appellant further argues there was other, less unfairly prejudicial evidence available of Appellant's knowledge of claims processes. Appellant cites testimony that he had previously served as a claims officer, and suggests the evidence of the 2014 and 2017 claims themselves demonstrate he knew how to file a household goods claim. However, evidence of the 2011 claim goes well beyond this sort of generalized knowledge of the claims process. The 2011 claim indicated Appellant had, through personal experience and before he filed his 2014 claim, learned how TSPs adjudicate such claims, what types of loss or damage were likely to be compensated, and more generally that he personally could obtain significant amounts of money through the claims process.

Accordingly, we conclude the military judge did not abuse his discretion by permitting the Government to introduce evidence of Appellant's entire 2011 claim as evidence of his knowledge of the claims process, the absence of mistake, and the existence of a scheme or plan.

## C. Trial Counsel's Findings Argument

### 1. Additional Background

During the CTC's argument on findings, he noted similarities between the items Appellant claimed in 2011, 2014, and 2017, including, *inter alia*, missing shelves from bookcases, missing remote controls, missing weights, a damaged speaker, and a damaged music stand. He further noted the large number of total items claimed each year, the large number of items Appellant specifically claimed were missing, and the large payments Appellant obtained in 2011 and 2014—approximately $16,000.00 and $33,000.00, respectively. Appellant concluded this portion of his argument, "Through this series of claims, members, the accused engaged in a plan, a scheme to fraudulently obtain money from his transportation service providers."

Later in his argument, the CTC referred to the inspections of transit-related damage to Appellant's property conducted by the claims inspectors BW, MM, and MP in 2011, 2014, and 2017, respectively. He argued:

> This first [anticipated defense argument] that we're going to walk through in [sic] this transit-related damage means it must be new damage. That's not what the actual testimony was. The testimony was that they examine it, and if it appears that it could have been related to the transit, they will label it as transit-related damage. But you also heard testimony that one thing that would be helpful would be prior photos. Right? Prior information about the item, understanding what it looked like before, has it ever looked like this before? Members, you all have been provided that information. You don't rely on [BW] or [MM] or [MP, the three claims inspectors]. You're the fact finder in this

case. You are the fact finders in this case. You look at the photos that have been provided to you, and you look at those preexisting damages, and *you'll see what has been going on here, this scheme and plan that the accused has been engaging in from 2011 to 2017.*

(Emphasis added).

At a later point, the CTC addressed the significance of the "parts box" which was marked as delivered on the 2016 inventory but could not be located by AAction employees at Appellant's house on the day of delivery. The CTC argued:

> There is an issue with the parts box raised by [BT] and [TP], right? They told you about we couldn't find the parts box. We couldn't find the parts box. We didn't know where the parts box was. We couldn't find pieces to put things back together. I will turn your attention to Prosecution Exhibit 27. It's on page 1. It's line item number one on that page. It is the parts box. And I'd ask you to look over to the Shipper Check Destination and look at the "X" that is in that box as received and ask yourself what is going on at this house? What's going on at that house? *You just look back to the 2014 and 2011 claims, and you see the plan, the scheme, the chaos caused by [Appellant] in these moves to obtain money* because it's received, and then when the workers can't find the parts they need -- or when they need the parts to put things together, they can't find them.

(Emphasis added).

Still later, the CTC commented on evidence suggesting that—contrary to his testimony—Appellant knew his carbon copy of the 2016 inventory did not accurately reflect which items had been delivered to his residence at Minot AFB, and the improbability that Appellant's claims for items that were actually delivered were attributable to innocent mistakes. He argued:

> [I]s it probable that he truly was mistaken based on this? It's not, not for someone with knowledge of the claim system. Not for someone with knowledge of how the claims process works. *Not for someone who has set up this elaborate scheme -- this elaborate plan to do this in three consecutive moves.* Did he actually believe that despite the items sitting in his home? What's the probability of that?

(Emphasis added).

Trial defense counsel did not object to any of the portions of argument quoted above.

**2. Law**

"We review prosecutorial misconduct and improper argument de novo and where . . . no objection is made, we review for plain error." *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citing *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018)). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citation omitted). The burden of proof under a plain error review is on the appellant. *See United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citation omitted).

"Improper argument is one facet of prosecutorial misconduct." *Id.* (citation omitted). "Prosecutorial misconduct occurs when trial counsel 'overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *United States v. Hornback*, 73 M.J. 155, 159 (C.A.A.F. 2014) (quoting *Fletcher*, 62 M.J. at 179). Such conduct "can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, [for example], a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *Id.* at 160 (quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996)).

"A prosecutorial comment must be examined in light of its context within the entire court-martial." *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005) (citation omitted). "When a trial counsel makes an improper argument during findings, 'reversal is warranted only when the trial counsel's comments taken as a whole were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone.'" *United States v. Norwood*, 81 M.J. 12, 19 (C.A.A.F. 2021) (quoting *Andrews*, 77 M.J. at 401–02). "We weigh three factors to determine whether trial counsel's improper arguments were prejudicial: '(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction.'" *Andrews*, 77 M.J. at 402 (quoting *Fletcher*, 62 M.J. at 184).

**3. Analysis**

Citing the portions of the Government's findings argument quoted above, Appellant contends the CTC improperly argued that Appellant's 2011 claim was fraudulent. Appellant notes that during the Mil. R. Evid. 404(b) motion hearing described above, the CTC conceded the Government did not have "a good faith basis to argue" the 2011 claim was fraudulent "based on the evidence" it had. In addition, the military judge ruled that evidence of the 2011 claim was admissible as "evidence of a common scheme or plan *as to the 2014*

*and 2017 claims*," and he instructed the court members they could consider evidence of the 2011 claim for "the limited purpose of its tendency, if any, to prove a plan or design of the accused to wrongfully obtain money through false claims for broken or missing items through *subsequent* household goods moves." (Emphasis added). Therefore, Appellant contends, it was error for the CTC to argue Appellant had a criminal scheme or plan in 2011.

Because the Defense did not object at trial, the initial question is whether the CTC's argument rose to the level of plain or obvious error. Although the CTC did not specifically argue that the 2011 claim in particular was fraudulent, in each instance quoted above he spoke about the series of claims in such a way as to at least imply Appellant had fraudulent intent in 2011, and thereby exceeded the scope of the military judge's ruling. For purposes of our analysis, we will assume the CTC's comments were plainly erroneous.

However, after considering the three factors the CAAF set forth in *Fletcher*, we conclude such an error did not materially prejudice Appellant's substantial rights. As to the first factor, we find the severity of the error to be slight. The fact that trial defense counsel did not object to any of these instances is some indication of their immateriality. *See United States v. Gilley*, 56 M.J. 113, 123 (C.A.A.F. 2001) (citation omitted). In addition, each of these four instances was a brief passing reference in a lengthy argument that spanned approximately 30 pages of the transcript. More significantly, although the argument may have exceeded the permissible use of evidence of the 2011 claim by implying that claim was also fraudulent, it was nevertheless very closely related to a permissible use. Although the military judge's ruling did not permit the Government to argue that the 2011 claim itself was fraudulent, the Government was allowed to argue evidence of the 2011 claim demonstrated Appellant's subsequent claims in 2014 and 2017 were fraudulent. This narrow distinction was not of a nature to materially affect the court members' deliberations. Indeed, the court members' findings of not guilty as to the charged larceny in 2014 indicate they were not persuaded Appellant had a common fraudulent scheme or plan from 2011 to 2017.

With regard to the second *Fletcher* factor, because the Defense did not object, the military judge did not specifically address the improper argument. However, the military judge did provide other findings instructions that we may presume had some prophylactic effect. *See United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2012) ("Absent evidence to the contrary, this Court may presume that members follow a military judge's instructions." (citations omitted)). He instructed the court members that argument by counsel was not evidence, and the members were to decide the issues based on the evidence and the instructions from the military judge. More particularly, he instructed that the members could consider evidence of the 2011 claim for the "*limited purpose*

of its tendency, if any, to prove a plan or design . . . to wrongfully obtain money through false claims for broken or missing items through *subsequent* household goods moves, . . . ." (Emphasis added). Not only is there no evidence the court members misused the evidence, but as stated above their findings indicate they were not persuaded by the Government's argument regarding a common plan or scheme across multiple moves and claims.

Finally, with regard to the strength of the evidence, as described above with respect to legal and factual sufficiency, the Government presented a compelling case that Appellant knowingly tried to obtain by false pretenses over $500.00 by filing a claim for items for which he knew he was not entitled to payment. To be sure, Appellant testified in his defense that he was not guilty of the allegations, but the court members evidently and reasonably found much of his testimony was not credible. Given the nature of both the evidence in the case and of the improper argument, we are not persuaded the CTC's error affected the court members' findings of guilty as to attempted larceny. The strength of the evidence supporting Appellant's conviction for false official statement is a closer question, but for similar reasons we find no prospect that the erroneous argument played any substantial role in the court members' findings.

Weighing the *Fletcher* factors together and considering the CTC's comments in context, we are confident the court members properly convicted Appellant on the basis of the evidence alone.

## D. Sentence Severity

### 1. Law

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(c), UCMJ. "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (per curiam) (alteration in original) (citing *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009)). Although we have great discretion to determine whether a sentence is appropriate, we have no authority to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

### 2. Analysis

Appellant contends his sentence to a dismissal is inappropriately severe and this court should set it aside. He cites the extensive statements of support

from numerous individuals that he submitted both during presentencing proceedings and to the convening authority for clemency purposes, as well as his excellent record of duty performance. In addition, he cites the "confusing and inherently subjective" household goods claims process which by its nature involves negotiation. Furthermore, he contends it is a mitigating circumstance that he "did not expect to receive the [full] amount he claimed."

We are not persuaded. We recognize the numerous attestations of support from Appellant's family, friends, former supervisors, peers, and subordinates, as well as his duty performance and extensive volunteer work. We have also taken into account the particular context for Appellant's offenses and the dynamics of the household goods claims process. We are confident the court members took these considerations into account as well when they adjudged a sentence of a dismissal alone, without confinement, where Appellant faced a maximum term of confinement for ten years. Appellant was convicted of a serious offense, attempting to steal a significant amount of money to which he knew he had no right. In addition, he was convicted of making a false official statement. In light of their findings, the court members may have also found, and thus were permitted to consider for rehabilitation purposes in accordance with the military judge's mendacity instruction, that Appellant willfully provided materially false testimony. However commendable Appellant's behavior may have been in other respects, having given individualized consideration to Appellant, the nature and seriousness of the offenses, Appellant's record of service, and all other matters contained in the record of trial, we do not find his dismissal is inappropriately severe as a matter of law.

## E. Convening Authority's Jurisdiction to take Action

### 1. Additional Background

On 30 October 2018, the 14th Air Force commander, Major General (Maj Gen) Whiting, referred the charges and specifications for trial by a general court-martial. On the same day he convened a general court-martial of officer members by Special Order A-004, Headquarters 14th Air Force. Maj Gen Whiting subsequently amended the convening order and appointed new court members in Special Order A-1, Headquarters 14th Air Force, dated 8 October 2019. On each of these dates, the 14th Air Force commander was a properly designated general court-martial convening authority (GCMCA) as identified in Department of the Air Force Special Orders G-18-001 and G-19-001, dated 18 March 2018 and 15 January 2019, respectively, and in accordance with Article 22(a)(7), UCMJ, 10 U.S.C. § 822(a)(7).

Appellant was arraigned on 20 November 2018 and, after two continuances, his trial began on 28 October 2019. The court-martial announced its findings on 8 November 2019. Following the announcement of findings, after

consultation with the parties the military judge continued the proceedings until 30 December 2019.

On 20 November 2019, Maj Gen Shaw was appointed as the 14th Air Force commander.

The National Defense Authorization Act for Fiscal Year 2020 (NDAA) created the United States Space Force as a separate armed service within the Department of the Air Force, effective 20 December 2019. *See* NDAA for Fiscal Year 2020, Pub. L. No. 116-92, § 952, 133 Stat. 1198, 1561 (2019); *see also* 10 U.S.C. § 9081. The NDAA also redesignated Air Force Space Command, of which 14th Air Force was a subordinate command, as the United States Space Force. On 20 December 2019, the Secretary of the Air Force redesignated 14th Air Force as Space Operations Command (SpOC). The Secretary's memorandum additionally stated, *inter alia,* that "[a]ll U.S. Air Force authorities and policies, to include the application of any provision of law, continue to apply to all military and civilian personnel assigned to the U.S. Space Force."

Appellant's court-martial reconvened on 30 December 2019 and the court members sentenced Appellant to be dismissed from the Air Force.[17]

On 11 February 2020, the Secretary of the Air Force issued a memorandum identifying court-martial convening authorities within the United States Space Force, and expressly identified the SpOC commander as a GCMCA. The memorandum further provided, "Court-martial convening authorities for units having one or more predecessor units whose commanders were court-martial convening authorities will, upon activation, assume the court-martial convening authority responsibilities of their predecessor unit commanders for all matters then pending."

On 2 March 2020, the Defense filed a post-trial motion requesting the military judge set aside the findings of guilty and the sentence and dismiss "the court-martial" with prejudice. The Defense contended that the court-martial's jurisdiction ended when the convening command, 14th Air Force, ceased to exist on 20 December 2019. The Government filed its opposition to the defense motion on 11 March 2020.

The military judge denied the defense motion in a written ruling dated 26 March 2020. He held that the court-martial had been properly convened and, with respect to the 30 December 2019 sentencing proceeding,

> there is nothing in the . . . establishment of the Space Force on
> 20 December 2019 that suggests that a prior authorized action

---

[17] One of the original ten members of Appellant's court-martial was excused for cause from the sentencing proceedings.

by a convening authority would subsequently become invalid or should be treated as a nullity. Accordingly, the court continued to be properly convened through the announcement of sentence on 30 December 2019. As *US v. Prescott* was properly convened against a person subject to the [UCMJ], there was and is ongoing jurisdiction.

The military judge further ruled that the question of who was the correct person to take action on the results of the court-martial was not ripe for decision.

In his clemency submission, Appellant asserted that Maj Gen Shaw, as the commander of SpOC, lacked authority to take action on Appellant's sentence for several reasons. The SpOC staff judge advocate (SJA) disagreed and advised Maj Gen Shaw did have such authority. On 3 June 2020, Maj Gen Shaw approved Appellant's sentence.

**2. Law**

We review questions of court-martial jurisdiction de novo. *United States v. Hale*, 78 M.J. 268, 270 (C.A.A.F. 2019) (citing *EV v. United States*, 75 M.J. 331, 333 (C.A.A.F. 2016)). "When challenged, the [G]overnment must prove jurisdiction by a preponderance of evidence." *Id.* (citing *United States v. Morita*, 74 M.J. 116, 121 (C.A.A.F. 2015)). We also review questions of statutory and regulatory interpretation de novo. *United States v. Atchak*, 75 M.J. 193, 195 (C.A.A.F. 2016) (citing *United States v. Vargas*, 74 M.J. 1, 5 (C.A.A.F. 2014)); *United States v. Watson*, 69 M.J. 415, 419 (C.A.A.F. 2011) (citing *United States v. Estrada*, 69 M.J. 45, 47 (C.A.A.F. 2010)).

"Jurisdiction depends upon a properly convened court, composed of qualified members chosen by a proper convening authority, and with charges properly referred." *United States v. Adams*, 66 M.J. 255, 258 (C.A.A.F. 2008) (citations omitted). "When charges are referred to a court-martial, that court retains jurisdiction over the case from the point of referral through authentication of the record by the military judge, except when the convening authority withdraws the charges from the court-martial under [Rule for Courts-Martial (R.C.M.)] 604(a)." *United States v. Williams*, 55 M.J. 302, 304 (C.A.A.F. 2001) (citation omitted).

Article 22(a)(8), UCMJ, 10 U.S.C. § 822(a)(8), provides that any commanding officer designated by the service secretary concerned may convene a general court-martial. *See also* 10 U.S.C. § 822(a)(7) ("General courts-martial may be convened by . . . the commanding officer of . . . an air force . . . ."); R.C.M. 504(b)(1) ("Unless otherwise limited by superior competent authority, general courts-martial may be convened by persons occupying positions designated in Article 22(a) and by any commander designated by the Secretary concerned or empowered by the President."). Article 60(c)(1), UCMJ, 10 U.S.C. § 860(c)(1),

provides, "Under regulations of the Secretary concerned, a commissioned officer commanding for the time being, a successor in command, or any person exercising general court-martial jurisdiction may act under this section in place of the convening authority." Article 60(c)(2), UCMJ, 10 U.S.C. § 860(c)(2), provides, "Action on the sentence of a court-martial shall be taken by the convening authority or by another person authorized to act under this section."

### 3. Analysis

Through counsel, Appellant contends that the 14th Air Force commander—Maj Gen Shaw at the time—ceased to be a GCMCA on 20 December 2019, when 14th Air Force was redesignated SpOC as part of the United States Space Force without any explicit provision that the SpOC commander was a convening authority. Appellant acknowledges the Secretary did subsequently explicitly designate the SpOC commander as a GCMCA on 11 February 2020, before Maj Gen Shaw took action on Appellant's sentence. However, Appellant reasons that because neither Maj Gen Shaw nor any superior authority transferred Appellant's case to another convening authority before 20 December 2019, from 20 December 2019 until 11 February 2020 there was no existing convening authority for Appellant's court-martial. Appellant further argues the Secretary's 11 February 2020 memorandum purporting to give the SpOC commander GCMCA authority over existing courts-martial "does not account for the fact that a lapse [of] almost two months in GCMCA authority existed," and therefore Maj Gen Shaw did not "clearly ha[ve] the jurisdiction or authority to take action" on Appellant's court-martial. Appellant asks this court to set aside the convening authority's action and remand the case for a new post-trial process and action.

We find no cause to remand Appellant's case for a new convening authority action. The basic flaw in Appellant's argument is that jurisdiction is not predicated on the continuous existence of the convening authority that originally convened the court, or of any particular GCMCA. Instead, the UCMJ relies upon actors with appropriate authority taking actions at the relevant point in time. For purposes of analysis, we accept Appellant's contention that between 20 December 2019 and 11 February 2020 Maj Gen Shaw was not a GCMCA because the SpOC commander had not been explicitly granted such authority. However, that is immaterial. As Appellant concedes, his court-martial was properly convened by Maj Gen Whiting as the 14th Air Force commander. As the military judge correctly concluded, the court-martial's jurisdiction over the referred charges and specifications continued through the sentencing proceeding, notwithstanding the redesignation of 14th Air Force as SpOC in the interim. *See Williams*, 55 M.J. at 304 (citation omitted). Maj Gen Shaw may have lacked authority to take action on the sentence prior to 11 February 2020, but

as of that date the Secretary's memorandum clearly identified the SpOC commander as a GCMCA and as having responsibility for Appellant's court-martial. This clear expression of secretarial intent was more than sufficient to establish Maj Gen Shaw's authority to take action on 3 June 2020 in accordance with Article 60(c), UCMJ.

As a separate assignment of error, pursuant to *United States v. Grostefon*, 12 M.J. 431, 435 (C.M.A. 1982), Appellant personally reasserts the position argued in the Defense's post-trial motion—that the *court-martial* itself lost jurisdiction once the 14th Air Force commander ceased to be a GCMCA, and therefore we should set aside the findings of guilty and the sentence. We disagree for reasons similar to those explained above. Appellant fails to identify authority for the proposition that a properly convened court-martial becomes, in the military judge's words, "a nullity" simply because the convening command is redesignated as a new organization whose commander has not been expressly granted GCMCA authority. To the contrary, we conclude it does not. *See Williams*, 55 M.J. at 304 (citation omitted).

## F. Post-Trial Delay

Appellant was sentenced on 30 December 2019. On 2 March 2020, the Defense submitted a post-trial motion to dismiss the findings and sentence, asserting the court-martial's jurisdiction had ceased to exist when the convening command, 14th Air Force, ceased to exist on 20 December 2019 with the advent of the United States Space Force, as analyzed above. The Government submitted its written opposition to the motion on 11 March 2020. The military judge issued his ruling denying the motion on 26 March 2020.

The SJA signed his recommendation (SJAR) to the convening authority on 17 April 2020. The Defense's clemency submission on behalf of Appellant was dated 18 May 2020. The SJA signed the first addendum to the SJAR on 20 May 2020 and, although it did not contain "new matter," served it on the Defense in order to afford Appellant an additional opportunity to respond. Trial defense counsel submitted an additional response on 30 May 2020, and the SJA signed a second addendum for the convening authority on 1 June 2020. The convening authority took action on the sentence on 3 June 2020.

Appellant's case was docketed with this court on 24 June 2020. Appellant filed his assignments of error to this court on 20 May 2021 after being granted eight enlargements of time in which to submit his appeal. The Government submitted its answer brief on 25 June 2021, and Appellant submitted his reply brief on 12 July 2021.

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). The 156 days that elapsed

between sentencing and action exceeded the 120-day threshold for a facially unreasonable post-trial delay the Court of Appeals for the Armed Forces (CAAF) established in *Moreno*, 63 M.J. at 142. Similarly, the delay between docketing at this court and the issuance of this opinion exceeds *Moreno's* 18-month threshold for a facially unreasonable appellate delay. *Id*. Accordingly, we have considered the four factors the CAAF identified in *Moreno* to assess whether Appellant's due process right to timely post-trial and appellate review has been violated by either delay: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Id*. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004) (per curiam)).

However, the CAAF has held that where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing or his grounds for appeal. 63 M.J. at 138–39 (citations omitted). Appellant received no sentence to confinement and has not been subjected to incarceration, oppressive or otherwise. Moreover, we perceive no impairment to Appellant's ability to present grounds for appeal, and where an appellant's substantive appeal fails, his ability to present a defense at a rehearing is not impaired. *Id*. at 140. With regard to anxiety and concern, "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by [appellants] awaiting an appellate decision." *Id*. Appellant has made no showing of such particularized anxiety or concern with respect to either of the delays in question, and we perceive none.

Accordingly, we consider whether the delays in this case were so egregious as to adversely affect the public's perception of the military justice system. *Toohey*, 63 M.J. at 362. We conclude they were not.

With respect to the delay between Appellant's trial and the convening authority's action, we note the delay is partly attributable to the adjudication of Appellant's post-trial motion to dismiss. In addition, Appellant's lengthy trial was factually complex and the record includes more than 2,000 pages of transcript and more than 270 exhibits. Furthermore, the defense clemency submission was lengthy, including two memoranda from trial defense counsel, a lengthy memorandum from Appellant himself, and 36 other attachments.

Moreover, the SJA afforded the Defense an additional opportunity to respond to the first SJAR addendum; although this consumed an additional two weeks, we do not find that members of the public would consider this additional opportunity to be heard offensive to Appellant's due process rights. Considering all the circumstances, we find the delay was not egregious and did not impugn the fairness and integrity of the military justice system.

With regard to appellate delay, we note this court has issued its opinion within four months of the 18-month *Moreno* standard. The delay is largely attributable to the eight enlargements of time Appellant requested and was granted over the Government's opposition. In addition, on 16 February 2022, Appellant submitted a motion for leave to file a supplemental assignment of error (issue (11)), which this court granted on 25 February 2022. In doing so, Appellant "recognize[d] that by filing a supplemental assignment of error, it may increase the time necessary for this Court to review his case . . . . [Appellant] understands his right to speedy appellate review and knows that this supplemental assignment of error may be counted against him for speedy appellate purposes." The Government submitted its timely supplemental answer to issue (11) on 24 March 2022. Furthermore, as noted above, the nature of Appellant's trial was highly complex—which is reflected in the length of the parties' briefs to this court—and the record is very extensive. In the absence of any particularized prejudice to Appellant, we find the delay did not violate Appellant's right to due process.

Finally, recognizing our authority under Article 66(c), UCMJ, 10 U.S.C. § 866(c), we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude no such relief is appropriate.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

Accordingly, the approved findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court